PEARSON, SIMON &
WARSHAW, LLP
Daniel L. Warshaw
dwarshaw@pswlaw.com
Michael H. Pearson
mpearson@pswlaw.com
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
Fax: (818)788-8104

WHITFIELD, BRYSON &
MASON, LLP
Daniel K. Bryson
dan@wbmllp.com
900 W Morgan St
Raleigh, NC  27603
Tel: (919) 600-5000
Fax: (919) 600-5035

LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, PA
Matthew D. Schultz
mschultz@levinlaw.com
Brenton Goodman
bgoodman@levinlaw.com
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140
Fax: (850) 436-6140

GREG COLEMAN LAW, PC
Gregory F. Coleman
greg@gregcolemanlaw.com
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049

*Counsel for Plaintiffs & the Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN LYTLE and CHRISTINE MUSTHALER, <br><br> Plaintiffs <br> vs. <br> NUTRAMAX LABORATORIES, INC. and NUTRAMAX LABORATORIES VETERINARY SCIENCES, INC. <br><br> Defendants | Case No.: 5:19-cv-00835 <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **(1) Violations of Cal. Civil Code § 1750 (CLRA)** <br> **(2) Violations of Cal. Bus. & Prof. Code § 17500 (FAL)** <br> **(3) Violations of Cal. Bus. & Prof. Code § 17200 (UCL)** <br> **(4) Cal. Civil Code §§ 1791.1 & 1794 (Implied Warranty)** <br> **(5) Unjust Enrichment** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Justin Lytle and Christine Musthaler, on behalf of themselves and all others similarly situated ("the Class" or "Class members," as defined below), bring this Class Action Complaint against Defendants Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Sciences, Inc., (collectively, "Defendants") based upon Defendants' misrepresentations concerning the benefits and effectiveness of their canine supplements branded under the name Cosequin.  The Court has subject matter jurisdiction over this action pursuant to 28 USC § 1332.

## NATURE OF THE ACTION

1.   This is a class action on behalf of purchasers of Defendants' Cosequin canine joint health supplements, ("Cosequin" or "the Products"), for which Defendants make incomplete and inaccurate claims—both in advertising and on the packaging and packages—that would mislead and have in fact misled reasonable consumers into purchasing, using, and continuing to use the Products.  Defendants' claims are refuted by peer-reviewed, randomized, controlled clinical trials as alleged in detail below.

2.   Defendants research, develop, manufacture, market and sell supplements and nutraceuticals (foods or nutrients with purported medicinal or therapeutic benefits) both for human consumption and for consumption by household pets and other animals.

3.   Among the products is Cosequin, which Defendants market as the "#1 veterinarian-recommended retail joint health supplement brand" for dogs.

4.   Defendants hold Nutramax family of companies out as the "Leader in Joint Health."

5.   Defendants tout the Products as high-quality, "scientifically researched," efficacious  nutritional supplements that are subject to strict quality standards and which have been "[s]hown to be safe, *effective*, and absorbable in peer-reviewed, published, controlled, U.S. veterinary studies."  Defendants claim through imagery and text that, among other things, the products enhance joint flexibility and mobility and that they support or restore joint health, none of which is supported by any reliable science.

6.   Defendants' representations are not substantiated by any randomized,

controlled, peer-reviewed, published studies, and the published studies upon which Defendants' representations rely pertain to other products; are of poor quality; and are not generalizable.  Defendants fail to reference the randomized, controlled, peer-reviewed, published studies directly contradicting Defendants' representations.  In all, Defendants' representations in advertising, marketing, packaging, and packages are incomplete and inaccurate and therefore are misleading to reasonable consumers.

## PARTIES

7.  Plaintiff Justin Lytle is a resident and citizen of Apple Valley, San Bernardino County, California.

8.  Plaintiff Christine Musthaler is a resident and citizen of Laguna Niguel, Orange County, California.

9.  Defendant Nutramax Laboratories, Inc., ("Nutramax Labs") is a South Carolina corporation located in Lancaster, South Carolina.  Nutramax Labs researched and developed the Products.  Nutramax Labs may be served through its registered agent: Paracorp Incorporated, 2 Office Park Court, Suite 103, Columbia, SC 29223.

10.   Defendant Nutramax Laboratories Veterinary Sciences, Inc., ("NVS") is an affiliate of Defendant Nutramax Labs. It is a South Carolina corporation located in Lancaster, South Carolina.  Among other activities, NVS has since at least 2014 researched, marketed, distributed and sold the Products, including sale of the Products through Defendants' websites Nutramaxlabs.com and Cosequin.com.  NVS may be served through its registered agent: Paracorp Incorporated, 2 Office Park Court, Suite 103, Columbia, SC 29223.

## JURISDICTION & VENUE

11.   This Court has **general personal jurisdiction** over Defendants because Defendants have purposefully availed themselves of the privilege of doing business within the state, including within this district; have had continuous and systematic general business contacts within the state, including within this district; and Defendants can be said to have reasonably anticipated being haled into court in this forum.

12.     This Court has **specific personal jurisdiction** over Defendants because this action arises out of and relates to Defendants' contacts with this forum.  Specifically, Defendants' knowingly directed the Products through the stream of commerce into this district.  Defendants have advertised and marketed within this district through the use of sales representatives, through the wires and mails, and via e-commerce websites through which residents of this state and district can purchase the Products.  Defendants knowingly direct electronic activity into this state and district with the intent to engage in business interactions and have in fact engaged in such interactions.  Defendants sold the Products to veterinarians and other consumers in this district, including to Plaintiffs, who purchased the Products in this district and whose losses were incurred here.

13.     This Court has original **subject matter jurisdiction** over this action pursuant to CAFA, Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).  Plaintiffs are diverse from all Defendants and Plaintiffs seek to represent other Class members who are diverse from all Defendants. Plaintiffs allege the matter in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

14.     **Venue** is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.  Plaintiffs purchased the Products in this district and incurred losses in this district, including in this division.  Numerous other Class members also purchased the Products in this district. Defendants caused the Products to be offered for sale and sold to veterinarians and to the public, including Plaintiffs, in this district.

15.   **Venue** is proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendants.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

16.   Plaintiffs reallege and incorporate by reference the facts set forth in ¶¶ 1-6.

17.   The Cosequin for Dogs product line includes a variety of formulas and specifically includes at least the products identified below, all of which are researched, developed, produced, marketed and sold by Defendants. (*See* **Ex. A**, Color Reproductions of Product Packages & Accompanying Information from Cosequin.com.)

| Product Name | Active Ingredients |
|---|---|
| (a.)  Cosequin Regular Strength<br>(capsule) | • glucosamine hydrochloride (250 mg)<br>• sodium chondroitin sulfate (200 mg)<br>• manganese (2 mg) |
| (b.)  Cosequin DS Capsules<br>(sprinkle capsule) | • glucosamine hydrochloride (500 mg)<br>• sodium chondroitin sulfate (400 mg)<br>• manganese (2.5 mg) |
| (c.)  Cosequin DS<br>(chewable tablet) | • glucosamine hydrochloride (500 mg)<br>• sodium chondroitin sulfate (400 mg)<br>• manganese (3 mg) |
| (d.)  Cosequin DS Maximum Strength<br>(chewable tablet) | • glucosamine hydrochloride (500 mg)<br>• sodium chondroitin sulfate (400 mg)<br>• manganese ascorbate (3 mg) |
| (e.)  Cosequin Hip & Joint Plus Perna & HA<br>(chewable tablet) | • glucosamine hydrochloride (500 mg)<br>• methylsulfonylmethane (MSM) (500 mg)<br>• sodium hyaluronate (HA) (6 mg) |
| (f.)  Cosequin Minis Plus MSM & Boswellia<br>(soft chew (mini)) | • glucosamine hydrochloride (260 mg)<br>• methylsulfonylmethane (MSM) (175 mg)<br>• sodium chondroitin sulfate (130 mg)<br>• boswellia serrata extract (10 mg) |
| (g.)  Cosequin DS Maximum Strength Plus MSM &<br>Omega-3's<br>(chewable tablets) | • glucosamine hydrochloride (600 mg)<br>• sodium chondroitin sulfate (300 mg)<br>• methylsulfonylmethane (MSM) (250 mg)<br>• manganese ascorbate (3 mg) |
| (h.)  Cosequin DS Maximum Strength Plus MSM &<br>Boswellia<br>(soft chew) | • glucosamine hydrochloride (600 mg)<br>• methylsulfonylmethane (MSM) (400 mg)<br>• sodium chondroitin sulfate (300 mg)<br>• boswellia serrata extract (30 mg) |
| (i.)  Cosequin ASU Active Lifestyle<br>(chewable tablet) | • glucosamine hydrochloride (600 mg)<br>• sodium chondroitin sulfate (125 mg)<br>• methylsulfonylmethane (MSM) (125 mg) |

| | | |
|---|---|---|
| | | • avocado/soybean unsponifiables (ASU) powder (38 mg)<br>• boswellia serrate extract (20 mg)<br>• biotin (7.5mg)<br>• sodium hyaluronate (HA) (3 mg)<br>• manganese ascorbate (1.5 mg) |
| (j.) | Cosequin Omega-3 (liquid) | • total omega-3 fatty acids (1,300 mg)<br>• eicosapentaenoic acid (EPA) (680 mg)<br>• docosahexaenoic acid (DHA) (450 mg) |
| (k.) | Cosequin Calm (chewable bonelet) | • extracts of magnolia officinalis and phellodendron amurense (95 mg)<br>• l-theanine (45 mg)<br>• dried whey protein concentrate (30 mg)<br>• also includes: dextrose, magnesium stearate, microcrystalline cellulose, natural flavor, and silicon dioxide (unspecified amounts) |
| (l.) | Cosequin Hip & Joint Support Plus (Plus: Green Lipped Mussel, Omega-3's and HA) (chewable tablet) | • glucosamine (500 mg)<br>• methylsulfonylmethane (MSM) (500 mg)<br>• sodium hyaluronate (HA) (1 mg) |
| (m.) | Cosequin Advanced (chewable tablet) | • glucosamine (1200 mg)<br>• sodium chondroitin sulfate (300 mg)<br>• vitamins and minerals (varying amounts) |
| (n.) | Cosequin Minis Maximum Strength with MSM Plus Omega-3's (soft chew) | • glucosamine hydrochloride (260 mg)<br>• methylsulfonylmethane (MSM) (175 mg)<br>• sodium chondroitin sulfate (130 mg)<br>• total omega-3s (30 mg)<br>• EPA (15mg)<br>• DHA (10 mg) |
| (o.) | Cosequin MaxStrength Plus MSM (chewable tablet) | • glucosamine hydrochloride (600 mg)<br>• sodium chondroitin sulfate (300 mg)<br>• methylsulfonylmethane (MSM) (250 mg)<br>• manganese ascorbate (3 mg) |
| (p.) | Cosequin MaxStrength with MSM Plus Omega-3's (soft chew) | • glucosamine hydrochloride (600 mg)<br>• methylsulfonylmethane (MSM) (400 mg)<br>• sodium chondroitin sulfate (300 mg)<br>• total omega-3s (70 mg)<br>• EPA (35mg)<br>• DHA (20 mg) |

## **Sale of the Products**

18.    Defendants produce and sell hundreds of thousands of units of canine Cosequin products in the United States each year.

19.    Defendants placed the Products in the stream of commerce and distributed, offered for sale, and sold the Products to lay consumers including Plaintiff and Class

members in California and throughout the United States.

20.   Defendants placed the Products in the stream of commerce and distributed, offered for sale, and sold the Products to veterinarians with the knowledge and intent that veterinarians would (a) prescribe and sell the Products to dog-owning consumers and/or (b) sell the Products to dog-owning consumers without a prescription.

21.   Defendants researched, developed, designed, manufactured, marketed, advertised, sold and warranted the Products.

22.   Defendants' Cosequin.com website advises consumers that "Cosequin is available at your veterinarian, online and in most stores nationwide," and the site directs consumers to online and physical retail locations where they can purchase the Products, including (a) online retailers such as Chewy.com and PetSupplies4Less; (b) "nationwide retailers" such as Wal-Mart, Sam's Club, Costco, Target, and others; and (c) "in-store only" retailers such as Petsense, Pet Supplies Plus, Pet Supermarket, Kroger, and others.

23.   Defendants also offer the Products for sale nationwide directly through their online "Cosequin Store," which is sponsored by Defendant NVS.

24.   Defendants have consistently made public representations concerning the Products' benefits and effectiveness since at least 2014.

25.   Defendants' representations appear, among other places, on Defendants' web pages; in other online vending and marketing forums including sponsored videos on Youtube; in product pamphlets and other literature distributed by Defendants to veterinarians and lay consumers; on the product packaging (e.g., boxes containing the packages); and on the packages themselves.  Defendants also make representations to veterinarians through sales representatives.

26.   Defendants intended for consumers—both lay consumers and veterinarians— to rely upon Defendants' representations concerning the Products' benefits and effectiveness and Defendants expected, or had reason to expect, that veterinarians would convey Defendants' representations concerning the Products to lay consumers.

27.   It would be reasonable for both lay consumers and veterinarians to rely upon

Defendants' representations concerning the Products' benefits and effectiveness.

28.    It would be reasonable for veterinarians to convey to lay consumers the substance of representations made by Defendants to veterinarians and for lay consumers to rely upon those representations.

29.    Defendants' representations concerning the Products' benefits and effectiveness were made with the intent to generate sales of the Products.

## **Defendants' Misrepresentations About the Products**

30.    Defendants make representations concerning the benefits and effectiveness of Cosequin canine products both generally and with respect to the various specific formulations (sub-brands or styles) of the Products identified in ¶ 17.

31.    Defendants make both express and implied representations concerning the Products' benefits and effectiveness.

32.    Defendants' representations have been refuted by randomized, controlled trials and thus are inaccurate and misleading to the extent they expressly or impliedly claim:

a.    that Cosequin improves lameness or inactivity;

b.    that Cosequin improves joint flexibility or canine mobility;

c.    that Cosequin improves canine interaction with toys, other dogs, or owners;

d.    that Cosequin will restore elderly dogs to a state of youthful vigor;

e.    that Cosequin maintains or rebuilds cartilage or supports or maintains healthy joints or that it accomplishes any of the above by doing so; and/or

f.    that any of the above claims have been demonstrated or substantiated through controlled trial or other reliable scientific study.

33.    The representations identified in ¶ 32 and any substantively similar representations by Defendants are untruthful.

34.    The representations identified in ¶ 32 and any substantively similar representations by Defendants are not supported by published studies or veterinary medical literature.

35.    The representations identified in ¶ 32 and any substantively similar representations by Defendants are not supported by any unpublished internal studies performed by Defendants or on their behalf.

36.    The representations identified in ¶ 32 and any substantively similar representations by Defendants are not supported by any unpublished studies.

37.    **Representations re Canine Cosequin Products Generally.** Via the Cosequin.com website (why-joint-health-supplements-for-dogs), Defendants' make the following representations, among others, concerning all canine Cosequin products in general:

    a.    "Joint Health Supplement"

    b.    "YOUR BEST FRIEND'S JOINT HEALTH"

    c.    "Observed changes in your dog may include: Less active, Difficulty going up and down stairs; Difficulty sitting or standing; Stiff or uncomfortable when getting up; Decreased interest in interacting   with you, other animals   or toys.

    d.    "With age, injury, or over-activity, the process of [cartilage] breakdown can exceed the process of replacement leading to problems in the joints. These problems result in less flexibility. That's when it's time for Cosequin which maintains the cartilage structure and inhibits the enzymes that break down cartilage."

    e.    "The ingredients in Cosequin work together to help support and protect the cartilage."

    f.    [Video]: "It's a glucosamine/chondroitin supplement that really helps maintain healthy joints."

38.    The representation in ¶ 37c. implies that use of Cosequin will rectify the "observed changes" in a consumer's pet dog and thereby implies that Cosequin improves canine flexibility and mobility (e.g., improving "stiff[ness]" or improving mobility on stairs).  The representation at ¶ 37d. implies that use of Cosequin will improve flexibility

and prevent further cartilage breakdown.  The claims in ¶ 37a-b. and 37e-f. regarding joint health are inaccurate in that they appear together with the misleading representations in ¶ 37c-d. and thus imply that the benefits and effects of "joint health" and "maintain[ing] healthy joints" are those identified in ¶ 37c-d.

39.   No randomized, controlled, peer-reviewed, published study of Cosequin has demonstrated objectively that Cosequin improves flexibility or mobility or leads to increased activity; causes increased interest in interacting with owners or toys; or prevents cartilage breakdown by "supporting and protecting" cartilage or otherwise.

40.   In fact, randomized, controlled, peer-reviewed, published studies show that glucosamine/chondroitin supplements administered to dogs—including Cosequin—lead to no significant improvement in gait, joint mobility, overall activity, or joint health.

41.   Defendants make similar and at times identical claims for specific Cosequin canine formulations in addition to making them for all formulations generally.

42.   In short, the representations set out in ¶ 37: (a) are not substantiated by any rigorous or reliable scientific study; (b) have been refuted by randomized, controlled trials, and (c) are inaccurate, and therefore are misleading.

43.   **Additional Representations re Canine Cosequin Products Generally**. Via the Cosequin.com website (cosequin-difference), Defendants' make the following additional representations concerning all canine Cosequin products in general:

a.   "Why Cosequin for Dogs? Cosequin Joint Health Supplement is a scientifically researched nutritional supplement to help dogs maintain healthy joints."

b.   "How Can Cosequin Help Your Pet? Shown to be safe, effective, and absorbable in peer-reviewed, published, controlled, U.S. veterinary studies."

c.   "As dogs age, it is common for their joints to become less flexible which impacts their mobility and quality of life. You may have noticed that your dog has difficulty walking up stairs or jumping on the bed. While he used to be eager to play, now he is content to rest. Even at younger ages some dogs

are subject to joint health concerns which affect flexibility and mobility. Cosequin contains TRH122 chondroitin sulfate, FCHG49 glucosamine and manganese ascorbate. These ingredients have been scientifically formulated to support and maintain the health of your dog's joints. Published studies have shown that the specific combination of ingredients in Cosequin works together to maintain the structure of the cartilage in your dog's joints while inhibiting the enzymes that break down cartilage. It is very important to note that the published studies on Cosequin do not apply to other brands."

44.   As stated in ¶ 43a.,  Cosequin has been "scientifically researched;" but the implication that scientific research supports Defendants' claims is inaccurate and misleading.  The representation in ¶ 43b implies that "peer-reviewed, published, controlled U.S. veterinary studies" support the claims set forth here, which is untrue.

45.    The representation quoted in ¶ 43c. implies that use of Cosequin will improve mobility by rectifying the behaviors described (e.g., inability to climb stairs or jump on beds).  Likewise, it implies that use of Cosequin will improve "flexibility and mobility" by maintaining cartilage structure and inhibiting breakdown of cartilage.

46.   No randomized, controlled, peer-reviewed, published study of Cosequin has demonstrated objectively that Cosequin helps dogs maintain healthy joints; that it is "effective" with respect to any of the behaviors or conditions described by Defendants as set forth in ¶ 43; or that it improves flexibility or mobility.

47.   In fact, randomized, controlled, peer-reviewed, published studies have shown that glucosamine/chondroitin supplements administered to dogs—including Cosequin— led to no significant improvement in gait, joint mobility, overall activity or joint health, including no higher "activity counts" when compared to placebo.

48.   Defendants make similar and at times identical claims for specific Cosequin canine formulations in addition to making them for all formulations generally.

49.   In short, the representations set out in ¶ 43: (a) are not substantiated by any rigorous or reliable scientific study; (b) have been refuted by randomized, controlled

trials; and (c) are inaccurate and therefore misleading.

50.  **Representations re Canine Cosequin Effects on Flexibility & Mobility.** As seen herein, Defendants' marketing of the Products consistently touts Cosequin as effective in addressing lack of flexibility and mobility, leading to greater activity and a greater range of activities for dogs who take Cosequin.  Other examples abound.

a.  [Video]: "Why does Duke take Cosequin? So he can get up and down the stairs. Keep 'em moving   with Cosequin." (showing dog climbing and descending stairs).

b.  [Video]: "Thanks to the Cosequin Mini Soft Chews for his joints, Scout can make use of all the space  in his new home" (showing dog running outdoors).

c.  [Video]: "Throughout the years, you've kept your best friend moving, with Cosequin! Because no other brand compares" (showing lab puppy ascending stairs and elderly lab descending stairs).

d.  [Youtube Video]: "Why does Walter take Cosequin? So he can keep up with the ladies. You go dog! Keep 'em moving with Cosequin joint health supplements" (depicting bulldog walking among a pack of French poodles).

e.  [Youtube Video w/Jack Hanna as Spokesman]: "Love your pet and trust your vet. Keep 'em moving with Cosequin" (showing running dogs).

f.  [Youtube Video]: "Why does Daisy take Cosequin? So she can jump in and call shotgun…. unless somebody called it first. Keep 'em moving with Cosequin joint health supplements" (showing dog running across field and jumping into bed of pickup truck).

g.  [Youtube Video]: "Why do Sophie and Sadie take Cosequin? So they can climb up those stairs and  settle in for the night. Keep 'em moving with Cosequin joint health supplements" (showing dogs running up stairs).

h.  [Youtube Video]: "Why does Romeo take Cosequin? So he can run across

the field and live up to his name. Keep 'em moving with Cosequin joint health supplements" (showing dog running across field).

51.     Defendants feature videos on their nutramaxlabs.com website as well, including one entitled "Animal Joint Health," which claims that "When Nutramax Laboratories introduced Cosequin to the veterinary market, the concept of using natural ingredients to protect joint cartilage took a while to catch on; but veterinarians became convinced once they saw that Nutramax Laboratories was committed to using quality ingredients that had been the subject of published, peer-reviewed studies for absorption, safety and efficacy." Ms. Barbara Eves ("Director, Veterinary Science Division Nutramax Laboratories, Inc.") claims "It's the only product that has been proven safe, effective, and absorbable in dogs in published controlled studies" (while on the screen is an article titled "The Bioavailability and Pharmacokinetics of Glucosamine Hydrochloride and Low Molecular Weight Chondroitin Sulfate After Single and Multiple Doses to Beagle Dogs," which, as its title suggests studied bioavailability and pharmacokinetics, but did not study effectiveness) (Adebowale, 2002.)  The video features a veterinarian stating, "One of the most important things to me is that the product has been referenced that I can point out to my clients that other people in controlled studies have looked at it and the product works."  He later states that pets who take Cosequin "are really better, that they are running, they are playing…. wanting to play and jump."

52.     The claims made in the video discussed in ¶ 51 are consistent with other marketing claims described in this complaint and they are incomplete, inaccurate and therefore are misleading in their particulars and on the whole for the same reasons as other similar representations described in this Complaint.

53.     Another video on the nutramaxlabs.com website (still shot below) describes Cosequin as "the #1 veterinarian-recommended joint health supplement brand, used to improve mobility and comfort in pets. So if your pets are showing signs of slowing down, it may be their joints. Try Cosequin. Whether it's your dog or cat, help keep their joints

lasting longer with Cosequin."  Text in the video above a dog and cat and next to Cosequin canine and feline products asks "IS YOUR PET… avoiding stairs? not jumping? slowing down?" and later claims Cosequin has been "IMPROVING MOBILITY AND COMFORT FOR OVER 15 YEARS."



54.   The commercial described in ¶ 53 has run in web locations other than just the nutramaxlabs.com website and the claims made in the video are consistent with other marketing claims described in this complaint. They are incomplete, inaccurate and therefore are misleading in their particulars and on the whole for the same reasons as other similar representations described in this Complaint.

55.   A virtually identical commercial appears on the Defendants' website and makes identical claims with respect to dogs and cats, but also includes exotic animals.  It is misleading for the same reasons described above.

56.   Yet another video commercial on the same site (titled "Cosequin – A trusted product") features a veterinarian in a lab coat claiming that Cosequin is a "safe, effective and proven product and one that I can trust in and believe in."

57.   The commercial described in ¶ 56 has run in web locations other than just the nutramaxlabs.com website and the claims made in the video are consistent with other marketing claims described in this complaint. They are incomplete, inaccurate and therefore are misleading in their particulars and on the whole for the same reasons as other similar representations described in this Complaint.

58.   These and other video commercials making substantively identical claims are featured in numerous internet sites and reasonable consumers would consistently be misled by Defendants' incomplete and inaccurate claims that Cosequin has been proven to improve flexibility, mobility, activity levels, and the like when, in fact, randomized, controlled trials directly refute these claims.

59.   The "Official Facebook page for Cosequin" includes the same and similar videos and delivers the same messaging.  For example, Cosequin posted on February 15, 2019: "Giving your dog adequate exercise is vital for their health and overall wellness. Use Cosequin to help their joints mobility!"  The Cosequin Facebook presence is replete with similar messaging and imagery and "keep them moving with Cosequin"-themed ads.

60.   Similarly, Defendants' Instagram presence is replete with images suggesting Cosequin improves flexibility, mobility, activity levels, and the like while consistently,

and inaccurately, claiming or suggesting through text and imagery that Cosequin will restore older dogs to a state of youthful vigor and otherwise improve their ability to run, jump, climb stairs, and the like, all of which is inaccurate and therefore is misleading. Examples include those seen below.









61.    Packaging and packages for the Products are consistent with the imagery and messaging seen on Defendants' website, Facebook page, and elsewhere on the internet. Below are (a) the banner from cosequin.com/dogs; (b) the banner from the Cosequin

Store, and  (c-e) images of Cosequin packaging and packages from the online Cosequin Store, all of which convey through text and imagery an active, healthy lifestyle for dogs taking Cosequin, thereby implying improved flexibility and mobility.





 

62.    The packaging and packages for various Cosequin formulations exemplify Defendants' emphasis on "mobility" (see superimposed colored boxes, which are used throughout the complaint) and a "healthy lifestyle," despite the fact that no rigorous or reliable scientific study has objectively established that Cosequin improves mobility or promotes a "healthy lifestyle," and, in fact, randomized controlled trials on Cosequin have shown no increased flexibility, mobility or activity as compared to placebo.











63.   Similarly, this image of the back of a Cosequin DS package states bluntly (and inaccurately), as seen in the superimposed red box: "Use Cosequin to help your pet Climb stairs, Rise, and Jump!"  The package also includes the misleading claim that Cosequin provides "Maximum joint protection."



64.     The packaging for Cosequin Advanced Plus Vitamins and Minerals expressly (and inaccurately) claims enhanced mobility, both textually and graphically. The package also, like others, claims Cosequin will "help your pet climb stairs, rise and jump!"—a claim devoid of any scientifically-validated foundation.



65.    Packaging for Cosequin Hip & Joint Support Plus includes the same imagery and misleading messaging that Cosequin helps your dog "Climb stairs, Rise, and Jump!"



66.    Again the marketing claim that Cosequin helps pets "Climb stairs, rise and jump!" is seen on the back of the package for Cosequin Maximum Strength DS Plus MSM Soft Chews (see front of package touting "mobility" in ¶ 62):

67.    The back of the package for Cosequin Minis Maximum Strength with MSM Plus Omega-3's (see front of package touting "mobility" in ¶ 61e.) again shows Defendants' marketing focus on "mobility," which not only has never been scientifically validated, but has been shown through valid, controlled studies to be no more true for Cosequin than for placebo:

68.    The back of the package for Cosequin Minis Plus MSM & Boswellia (see front of package touting "mobility" in ¶ 62) contains the same claim:



69.     Defendants' consistent messaging across different formulations/sub-brands, different media, and across all marketing touchpoints means that messaging for any one formulation/sub-brand reinforces its inaccurate and misleading claims for other and all formulations/sub-brands.

70.     Defendants also employ integrated marketing with the intent that consumers will be exposed to as many Cosequin marketing messages as possible.  For example, the packages depicted in ¶¶ 66-67 reference special offers at Cosequin.com and include icons for Facebook, Twitter and lyptyv.com (which redirects one to Cosequin.com), where, if visited, consumers would be exposed to different formulations and additional and consistent marketing messages for all Cosequin canine products (as well as feline and equine products, which are marketed making similar and sometimes identical claims).

71.     Despite Defendants' consistent marketing focus on flexibility and mobility, (e.g., running,  jumping, stair-climbing, and so forth), no randomized, controlled, peer-reviewed, published study of Cosequin has demonstrated objectively that Cosequin improves flexibility or mobility or enhances a dog's ability to engage in any physical activity.

72.     In fact, as alleged below, the only two randomized controlled trials of Cosequin or Cosequin ingredients both demonstrated no improvement in this regard over placebo.

**The Lack of Scientific Foundation for Defendants' Representations**

73.     Responsible pet supplement manufacturers ensure there is reliable scientific support for any claim they make concerning a supplements benefits or effectiveness.

74.     The Food and Drug Administration does not regulate the design, manufacture or marketing of Cosequin.

75.     However, a comparison of the science behind Defendants' claims about Cosequin's benefits and effectiveness and that required for approval of a new drug is pertinent and illustrative.

76.     When new pharmaceutical interventions are evaluated, FDA often requires

four phases of clinical study—Phase I trials on small groups to evaluate safety, determine safe dosages, and identify potential side effects; Phase II trials on larger groups to study effectiveness and further evaluate safety risks; Phase III trials with large groups to confirm effectiveness, to monitor side effects, to compare to other commonly used treatments, and to collect other safety-related information; and Phase IV post-marketing studies to provide additional information on benefits, risks, and the best use for drugs.

77.   Although Defendants claim Cosequin has life-altering therapeutic benefits, because Cosequin is an unregulated nutraceutical/supplement for use in pets, Defendants were required to do none of the above and chose not to do so voluntarily.

78.   Nevertheless, the scientific and veterinary community—sometimes sponsored by pet supplement manufacturers and sometimes independently—carries out *in vitro*, *ex vivo* and *in vivo* studies of various supplements and nutraceuticals from time to time, including randomized controlled trials of supplements and nutraceuticals.

79.   Glucosamine/chondroitin pet supplements are among the most widely purchased and prescribed of pet supplements and nutraceuticals and as such have received the attention of veterinary researchers.

80.   To appreciate the value of any given study, one must first distinguish between *in vitro* studies (those taking place outside of living organisms, e.g., in a Petri dish or test tube), *ex vivo* studies (testing on tissue from an organism in an external environment) and *in vivo* studies (taking place with/in living organisms, e.g., animal testing or clinical trials).

81.   *In vitro* and *ex vivo* studies can never alone, nor solely in conjunction with other *in vitro* or *ex vivo* studies, prove cause-and-effect relationships in whole living organisms, including causal claims of effectiveness.

82.   More specifically, *in vitro* and/or *ex vivo* studies of Cosequin or other glucosamine/chondroitin-based supplements—whether alone or in conjunction with other such *in vitro* or *ex vivo* studies—could not and do not provide reliable scientific support for claims that Cosequin is effective in causing joint support or protection in dogs;

effective in causing improved flexibility or mobility in dogs; effective in causing the prevention of cartilage breakdown in dogs, effective in rebuilding cartilage in dogs; effective in causing greater or more youthful activity in dogs; or effective in improving dog interactions with owners, toys, or other dogs.

83.    Even controlled studies of two or more drug or supplement *ingredients* cannot provide valid conclusions about the safety or effectiveness of those ingredients when combined into a single therapy so, for example, Ingredient A may be proven effective in reducing inflammation and Ingredient B may be proven effective in reducing pain; but it does not follow necessarily that a supplement containing Ingredients A and B would possess effective anti-inflammatory and analgesic properties in living organisms.

84.    Further, to appreciate the value of any given study, one also must distinguish between observational and experimental studies.

85.    Observational studies involve observing the effect of a risk factor, intervention, etc., without affecting who is exposed to it.  The predominant forms of observational study are cohort studies and case control studies.

86.    While observational studies can be quite valuable, they do not alone, nor solely in conjunction with other observational studies, prove cause-and-effect relationships (such as the effectiveness of a drug or supplement) because they are not randomized and therefore do not account for unknown and/or unmeasurable exposures, factors, or variables that may influence study results.

87.    As opposed to observational studies, experimental studies are ones where researchers introduce an intervention (e.g., a drug) and study its effects.  The most effective experimental studies are double-blinded, randomized, controlled trials (RCTs). RCTs, if properly designed and executed, are considered the "gold standard" in therapeutic research and can support claims for cause-and-effect relationships (e.g., that a drug causes a given therapeutic benefit or risk or that it does not cause such benefit or risk).

88.    The Federal Judicial Center's *Reference Manual on Scientific Evidence* (3d

ed. 2011) at 217-18 puts it this way: "When causation is the issue, anecdotal evidence can be brought to bear. So can observational studies or controlled experiments. Anecdotal reports may be of value, but they are ordinarily more helpful in generating lines of inquiry than in proving causation. Observational studies can establish that one factor is associated with another, but work is needed to bridge the gap between association and causation. Randomized controlled experiments are ideally suited for demonstrating causation."

89.    These principles apply in veterinary science.  The Journal of the American Veterinary Medical Association (JAVMA) has correctly stated: "A sound experimental design includes all of the following safeguards: Control groups; Placebos or sham procedures; Blinded procedures; Random assignment of subjects to study groups [and] Adequate statistical power…. [O]bservational studies always have a high risk of confounded effects…. Whenever possible, the results of observational studies should be confirmed or disconfirmed through conduction of well-designed experimental studies."[1]

90.    A handful of RCTs have been performed on Cosequin and other glucosamine/chondroitin supplements and nutraceuticals intended for use in dogs.

91.    To date, no peer-reviewed, published RCT provides objective support for claims that Cosequin is effective in causing joint support or protection in dogs; that Cosequin is effective in causing improved flexibility or mobility in dogs; that Cosequin is effective in preventing cartilage breakdown in dogs; that Cosequin is effective in rebuilding cartilage in dogs; that Cosequin is effective in causing greater or more youthful activity in dogs; or that Cosequin is effective in improving dog interactions with owners, other dogs, or toys.

92.    Moreau, 2003.[2]  This double-blind, placebo-controlled RCT involving 71

[1] Shott, Designing studies that answer questions, *JAVMA* Vol. 238, No. 1 (Jan. 1, 2011).

[2] Moreau, M., et al., Clinical evaluation of a nutraceutical, carprofen and meloxicam for the treatment of dogs with osteoarthritis, *Vet. Record* No. 152 at 323-29 (2003).

dogs over 60 days evaluated Cosequin, carprofen (an NSAID) vs. meloxicam (an NSAID).  Dogs were assigned to one of four conditions: placebo, meloxicam, carprofen, or Cosequin DS.  The authors objectively assessed improvements in pain-related functional impairment by measuring ground reaction forces of arthritic limbs and there was subjective assessment by surgeons and owners of gait, joint mobility, joint pain and discomfort, lameness, and activity.  Notably, researchers found, "The dogs treated with CS-G-M [Cosequin DS] showed no significant response in terms of the objective gait analysis or either of the subjective assessments during the study," while there was a significant response with the NSAID carprofen.  Likewise, "In terms of the owners' subjective assessment, no significant improvements were provided by either CS-G-M [Cosequin DS] or carprofen over the 60 days of treatment."  In sum, Cosequin at recommended doses showed no significant improvement on subjective or objective assessment.

93.  McCarthy, 2007.[3]  This double-blind, active-controlled RCT of 35 dogs over 70 days evaluated the efficacy of Synoquin—a glucosamine/chondroitin supplement.[4] Some dogs were given Synoquin and others carprofen (an NSAID), as a control. No placebo was used.  No objective assessment was involved. Instead, veterinarians subjectively assessed the dogs and used a 5-point scale to describe lameness, joint mobility, pain on palpation, weight-bearing, and an overall score of clinical condition. Dogs in the Synoquin group showed statistically significant improvement for pain, weight-bearing and overall condition compared to pre-treatment scores.  Lameness and

---

[3] McCarthy, G. et al., Randomised double-blind, positive-controlled trial to assess the efficacy of glucosamine/chondroitin sulfate for the treatment of dogs with osteoarthritis, *Vet. J.* No. 174 at 54-61 (2007).

[4] Like Cosequin, the primary ingredients in Synoquin were glucosamine hydrochloride and chondroitin sulfate, but the formulation was not identical to any Cosequin formulation (e.g., it included zinc sulfate, ascorbic acid and *N*-acetyl-D-glucosamine). Defendants state on their Cosequin.com website that "published studies on Cosequin do not apply to other brands."

joint mobility scores were not significantly improved. The carprofen group improved in all categories. The authors acknowledge the limitation of not using objective assessment (as Moreau did). The study was funded by VetPlus, Ltd., which markets Synoquin, the supplement under study.  In sum, the study showed that a glucosamine/chondroitin supplement other than Cosequin improved pain and weight bearing, but not lameness or joint mobility, on subjective assessment.  The study is compromised by using "within group" comparisons.

94.   D'Altilio, 2007.[5]   This double-blind, placebo-controlled RCT studied for 120 days (+30-day withdrawal period) 20 dogs presenting with joint stiffness, lameness, moderate pain, swollen joints, difficulty getting up/down, and difficulty walking in horizontal areas or stairs.  Subjective assessments of pain were made based on observation as compared to baseline.  There were four arms: (1) Glucosamine hydrochloride/chondroitin sulfate (2000/1600mg) + collagen, (2) GH/CS only, (3) collagen only, and (4) placebo.  Glucosamine hydrochloride/chondroitin sulfate supplements were formulated by a Nutramax competitor.[6] The placebo arm saw no reductions in pain. The glucosamine/chondroitin arm experienced a reduction in pain but it was not significant and showed relapse following the 30-day treatment withdrawal period.  In sum, glucosamine/chondroitin treatment did not result in significant reductions in OA-related pain in dogs based on subjective assessment. The authors make numerous statistical errors and fail to report significant factors that impact the statistical analysis.

95.   Gupta, 2012.[7]   This double-blind, placebo-controlled RCT of 31-37 dogs

[5] Therapeutic Efficacy and Safety of Undenatured Type II Collagen Singly or in Combination with Glucosamine and Chondroitin in Arthritic Dogs, *Tox. Mechanisms & Methods*, 17:189-196 (2007).

[6] The glucosamine/chondroitin formulation used was not identical to any Cosequin formulation.

[7] Gupta, R.C., et al., Comparative therapeutic efficacy and safety of type-II collagen (uc-II), glucosamine and chondroitin in arthritic dogs: pain evaluation by ground force plate, *J. of Animal Physiology & Animal Nutr.* 96(5) at 770-77 (2012).

evaluated the efficacy of collagen and glucosamine/chondroitin products in treating canine osteoarthritis. It used ground force plates and impulse area measurements to objectively assess for pain. Subjective assessments included overall pain, pain upon manipulation, pain after physical exertion, signs of lameness, severity of pain during activity, and overall performance (including running, participating in activities, and sitting/standing activities). Cosequin was not used and the formulation used was not identical to any Cosequin canine formulation. Dogs (n=7-10) were assigned to one of four conditions: (I) placebo, (II) collagen, (III) glucosamine/chondroitin 2000/1600mg and (IV) collagen + glucosamine/chondroitin.  Based on subjective assessments, there was statistically significant pain reduction in groups II, III & IV.  There was no objective evidence of decreased arthritic pain in the glucosamine/chondroitin groups.  In sum, the study showed significant pain reduction for a glucosamine/chondroitin supplement, but objective assessment showed no significant pain reduction.  The authors make numerous statistical errors and fail to report significant factors that impact the statistical analysis.

96.    <u>Scott, 2017</u>.[8]  This double-blind, randomized and placebo-controlled trial studied 60 dogs over 97 days. The dogs either were orally administered glucosamine hydrochloride/chondroitin sulfate (n=30) or a placebo (n=30).   The supplement was Dasuquin, manufactured by Defendants.[9]  Activity was objectively monitored continuously throughout the 97-day study by activity monitors that generated activity counts. Results were statistically analyzed. No difference was found between groups when evaluating daily activity counts during the seven-day pre-treatment period and the 90-day treatment period. Owner assessment (pain interference and pain severity scores)

---

[8] Scott, et al., Efficacy of an oral nutraceutical for the treatment of canine arthritis: A double-blind randomized, placebo-controlled prospective clinical trial, *Vet. Comp. Ortho. Traumatol.*, 30 at 318-23 (2017)

[9] Dasuquin contains the same proprietary glucosamine hydrochloride and sodium chondroitin sulfate used in Cosequin.  It also includes avocado/soybean unsaponifiables (ASU) powder, which at least one Cosequin formulation contains. But it is not identical to any Cosequin formulation. (https://www.dasuquin.com/en/dasuquin-soft-chews/)

improved over the 90-day treatment period for both groups, however no difference was found between treatment groups. The authors conclude that owner assessment scores suggest a caregiver placebo effect. As the authors concluded, "In this randomized, placebo-controlled, clinical trial, we found that Glu/CS+ [Dasuquin] did not have a beneficial treatment effect when compared to placebo treatment when evaluated by [subjective] daily owner questionnaire and [objective] patient activity counts."

97.    In all, only one published, peer-reviewed RCT has assessed a Cosequin product (Moreau, 2003). It was a prospective, double-blind, placebo-controlled study and it found (a) that objective evidence showed no improvement in pain-related functional impairment (assessed based on kinetic gait analysis) and (b) that subjective assessments by pet owners and orthopedic surgeons showed no improvements in joint mobility, joint pain and discomfort (a proxy for flexibility, i.e., how far can a joint flex without experiencing pain), lameness, or activity. In other words, the study refutes Defendants' claims concerning joint health, joint flexibility, mobility, pain relief, lameness and activity levels.

98.    Another RCT (Scott, 2017) tested Dasuquin, a product employing Defendants' proprietary glucosamine/chondroitin formulation, but which is not identical to any Cosequin formulation. This prospective, double-blind, placebo-controlled RCT concluded that the supplement was no more beneficial than placebo in objective assessment of activities or upon subjective assessment by pet owners. In other words, the study refutes Defendants' claims concerning mobility and activity levels—the primary thrust of Defendants' marketing efforts.

99.    Among the RCTs of other (i.e., non-Cosequin) glucosamine/chondroitin supplements, one found pain and weight-bearing improvements upon subjective assessment (no placebo), but no improvements in lameness or joint mobility (McCarthy, 2007); another found temporary, insignificant reductions in pain on subjective assessment (D'Altilio, 2007); and another found significant pain reduction upon subjective assessment, but not on objective assessment (Gupta, 2012). All three are compromised

by weak design and statistical reporting but, in any event, none provides objective support for Defendants' representations about Cosequin's benefits or effectiveness.

100.  In the 16 years since the Moreau study, Defendants have not commissioned or carried out any peer-reviewed, published RCT to challenge the results of Moreau's clinical trial or to justify their marketing representations about the benefits and effectiveness of Cosequin, which are contrary to Moreau's findings.

101.  Defendants have not commissioned or carried out any peer-reviewed, published RCT to challenge the conclusions of Scott's 2017 clinical trial (i.e., that use of Defendants' proprietary glucosamine/chondroitin formula has no beneficial effect over placebo with respect to canine activity levels), which are contrary to Defendants' graphic and textual representations about Cosequin's benefits and effectiveness.

102.  Defendants' Cosequin.com website says Cosequin has been proven "effective" through peer-reviewed, published studies; but it cites no studies.

103.  Defendants' Nutramaxlabs.com website purports to provide ample scientific support for their claims and states, "We believe that our products should be backed by science" and that Defendants "support studies *including efficacy* … at leading veterinary schools" while purporting to provide a "complete list" of research citations.



104.  Defendants' "complete list of the research citations" for Joint Health includes more than 80 citations characterized as "[j]oint health research & review articles using or referencing Nutramax products or ingredients."

105.  Defendants' "complete list of the research citations" for Joint Health does not include the Moreau (2003) randomized controlled trial, which used "Nutramax Laboratories products or ingredients" and which found no objective or subjective evidence of effectiveness in improving pain-related functional impairment, joint mobility, joint pain and discomfort, lameness, or activity in dogs.

106.  Defendants' "complete list of the research citations" for Joint Health does not include the Scott (2017) randomized controlled trial, which used "Nutramax Laboratories products or ingredients" and which found the glucosamine/chondroitin supplement under study (Nutramax's Dasuquin) was no more beneficial than placebo in objective assessment of canine activities or upon subjective assessment by dog owners.

107.  Defendants' "complete list of the research citations" does not include any randomized controlled trial in dogs of Cosequin or Cosequin's proprietary ingredients.

108.  Defendants' list of citations does not include titles of articles or links to the cited sources and some sources require membership in an organization or payment for the source, all of which makes it difficult for a veterinarian or consumer to verify whether, as Defendants state, the study involved Nutramax products or ingredients and which makes it difficult for a veterinarian or consumer to verify, as Defendants imply, that the studies all support Defendants' representations concerning the Products.

109.  While omitting randomized controlled trials that demonstrate the Products' lack claimed efficacy, Defendants' list includes citations to less rigorous and less scientifically/medically probative  sources such as symposium posters (e.g., Grzanna, 2009 and Kettenacker, 2007); case reports (e.g., van Blitterswijk, 2003) and a "workbook" from a veterinary conference (Orth, 2004).

110.  Defendants list of citations in fact is not a "complete list of the research citations" for "[j]oint health research & review articles using or referencing Nutramax

Laboratories products or ingredients."

111.  Because Defendants' list of citations regarding "[j]oint health research" is incomplete and omits rigorous controlled trials demonstrating lack of efficacy for the Products and/or their ingredients, Defendants' list of citations is inaccurate and misleading.

112.  Cosequin has potential side effects including diarrhea, upset stomach, loss of appetite, vomiting, and allergic reactions.

113.  The long-term safety of Cosequin has not been rigorously studied.

114.  The pharmacokinetics of Cosequin have not been scientifically verified through rigorous and repetitive study.

115.  Other medical literature provides ancillary support for Plaintiffs' allegations that Defendants' representations inaccurate and misleading.

    a.  *Plumb's Veterinary Handbook*—a leading text in the field—concludes in both its 2008 and 2017 editions that glucosamine/chondroitin sulfate supplements are "[w]ell tolerated, but efficacy is uncertain."

    b.  The *Banfield Journal* concluded in 2010 that "The limited number of   high quality clinical trials and the lack of data on objective measures of efficacy preclude recommendations of glucosamine hydrochloride and chondroitin sulfate nutraceuticals as a sole medical treatment for joint disease in dogs and cats. In brief, the benefits of using a combination of glucosamine hydrochloride and chondroitin sulfate nutraceuticals to improve symptoms associated with canine and feline joint disease has yet to be determined."[10]

    c.  A 2010 comment in the Journal of the American Veterinary Medicine Association reviewed the evidence to date concluded, "Glucosamine and

---

[10] Addleman, A., Evaluation of glucosamine hydrochloride/chondroitin sulfate nutraceuticals as a treatment to improve symptoms associated with canine and feline joint disease, *Banfield J.* at 3-6 (Winter 2010).

chondroitin are perhaps the most widely used nutraceuticals for treatment of osteoarthritis in human and veterinary patients. It is worth considering, however, that there is only very weak clinical trial evidence to support this practice and that it is appropriate for veterinarians to temper their recommendations to their clients accordingly."[11]

d.   A 2013 article in the journal *Veterinary Clinics of America: Small Animal Practice*, observed that "[g]lucosamine and chondroitin are nutritional supplements that are *anecdotally* recommended for use in patients with osteoarthritis." (emphasis added)  The author continued: "There has been only 1 published clinical trial incorporating both positive and negative controls that evaluated the efficacy of glucosamine and chondroitin supplements in dogs. Compared with placebo, no significant effects could be attributed to glucosamine and chondroitin, but significant improvements were shown for both carprofen [an NSAID] and meloxicam[an NSAID]. Current literature does not support the use of glucosamine and chondroitin supplements for the control of osteoarthritis pain in dogs."[12]

e.   A 2015 publication from the American College of Veterinary Nutrition in *Today's Veterinary Practice* observed, "Supplements are aggressively marketed for use in osteoarthritis but have limited evidence supporting their use, with the exception of DHA and EPA."[13]

116.  Defendants' bolster the purported credibility of their misrepresentations by

---

[11] What is the Evidence? *JAVMA* Vol. 237 No. 12 at 1382-83 (Dec. 15, 2010).

[12] KuKanich, V. Outpatient Oral Analgesics in Dogs and Cats Beyond Nonsteroidal Anti-inflammatory Drugs: An Evidence-based Approach. *Vet. Clin. Small Anim.*, Vol. 43 1109–1125 (2013).

[13] Shmalberg, *Today's Vet. Practice,* "Nutrition Notes: Canine Rehabilitative Nutrition" (Jan./Feb. 2015).

presenting Nutramax as a sophisticated company or group of companies distinguished by adherence to rigorous scientific and technical standards. The examples below are from Defendant Nutramax Labs' website (https://www.nutramaxlabs.com/corporate (2/19/19)).

## Quality Assurance (QA)



The Nutramax Manufacturing, Inc. Quality Assurance Department is staffed by professionals who ensure that the products manufactured and tested are made in accordance with the regulations governing our industry. The QA department audits for compliance to all applicable regulations. From incoming materials to release of product, QA ensures that the Good Manufacturing Practices (GMPs) are adhered to and all products manufactured meet label claims. The QA department is the independent reviewer of all internal operations.

## Quality Control (QC)



The Quality Control Department has three groups of technical experts: QC-Incoming, Analytical Chemistry, and Microbiology. These professionals ensure that ingredients received at Nutramax Laboratories are tested to meet specifications before being used in our products, during manufacturing, and after the manufacturing process. cGMP guidelines are the core for all QC lab operations.

## Research and Product Development



Our research and development team consists of cellular and molecular biologists who work together to identify and test ingredients contributing to the development of novel, science-based products for human and veterinary applications. Our focus is to demonstrate the efficacy of raw materials to ensure our products meet our quality standards.

As a general policy Nutramax Laboratories pays a maximum of 15% indirect costs to universities and other research organizations for external research collaborations.

117.  In addition to bolstering the companies' and Products' credibility, the web page depicted contains statements that are inaccurate, misleading or simply untrue.

118.  Defendants' Cosequin.com website contains similar content, depicting a scientist at work and touting the Products as "different" from other brands because they are "scientifically researched" in "published studies" and contain "scientifically formulated" compounds to improve "flexibility and mobility," among other things:



119.  The Cosequin.com website also touts Defendants' "Strict Quality Standards," claiming the Products are "Manufactured under very strict quality standards."

120.  Defendants' nutramaxlabs.com website includes FAQs stating: "Cosequin is manufactured in the United States by Nutramax Laboratories Veterinary Sciences, Inc. following manufacturing standards adopted by the pharmaceuical [sic] industry. Each batch of Cosequin is subjected to stringent quality control measures and meets label claim, while a study published in the Journal of the American Nutraceutical Association showed that over 80% of glucosamine/chondroitin sulfate brands did not meet their own

label claim."

121.  The representations and web content reflected in ¶¶ 118-120 include statements that are inaccurate, misleading or simply untrue.

122.  In short, Defendants' advertising and marketing represents to the public that Defendants' claims about the benefits and effectiveness of the Products have been scientifically established, but Defendants do not possess the level of proof claimed or any reliable level of proof for the claims and, indeed, rigorous studies refute their claims.

123.  As a result of the Defendants' consistent and pervasive misrepresentations regarding the Products, Plaintiffs and the Class have suffered damages including but not limited to (a) the purchase price for Products that reasonable consumers would not have bought had Defendants' misrepresentations and omissions not occurred and/or (b) the price premium Defendants are able to charge above and beyond generic Glu/Ch products due to their misrepresentations and omissions.

**Factual Allegations Specific to Plaintiffs**

124.  Plaintiff Justin Lytle, a resident and citizen of this district and division, purchased within the State of California in the past 12 months Cosequin DS Maximum Strength Plus MSM for his pet dogs Ziva and Zoeh (see Ex. A(o)).

125.  Mr. Lytle researched Cosequin online including visits to the Defendants' Cosequin and Nutramax websites; he has seen Cosequin advertisements and he read the packaging and package before giving Cosequin to his dogs.

126.  Plaintiff Christine Musthaler, a resident and citizen of this district, purchased within the State of California in the past 12 months Cosequin DS Maximum Strength Plus MSM chewable tablets for her pet dog Boomer (See Ex. A(o)).

127.  Ms. Musthaler researched Cosequin online and compared it to other products, including a visit or visits to the manufacturer's website nutramaxlabs.com; she has seen Cosequin advertisements and she read the packaging and package before giving Cosequin to her dog Boomer.

128.  Plaintiffs, as reasonable consumers, expected the Products to be effective as

claimed on the packaging and/or in Defendants' marketing and advertising.

129.   Plaintiffs, as reasonable consumers, would not have purchased the Products had Defendants apprised Plaintiffs that there is no scientifically valid basis for the representations made regarding the products on the packaging and/or through Defendants' marketing and advertising.

## CLASS ACTION ALLEGATIONS

130.  Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of a proposed class defined as follows:

> *All persons residing in California who purchased canine Cosequin products for personal use and not for resale within four years of the filing of this Complaint.*

131.  Excluded from the Class are: Defendants, Defendants' board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing; governmental entities; the Court, the Court's immediate family, and staff; and any person who timely and properly excludes himself or herself from the Class.

132.  Plaintiffs reserve the right to alter the Class definition as necessary to the full extent that the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Central District of California, and applicable precedent allow.

133.  Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

134.  <u>Numerosity; Rule 23(a)(1)</u>: The size of the Class is so large that joinder of all Class members is impracticable. Joint health pet supplements, including glucosamine/chondroitin supplements, are among the most widely prescribed and sold of all pet supplements and nutraceuticals in the United States.  Defendants tout Cosequin as the #1 Veterinarian Recommended Brand of joint health supplement. Plaintiffs believe there are thousands of Class members geographically dispersed throughout the State of California.

135.  <u>Existence and Predominance of Common Questions of Law and Fact; Rule 23(a)(2), (b)(3)</u>: There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions/issues include but are not limited to:

a.     what representations Defendants have made regarding the Products over time;

b.     the state of scientific and industry knowledge, including Defendants' knowledge, regarding the effectiveness of glucosamine/chondroitin-based canine joint health supplements;

c.     whether the Products in fact have any beneficial effect in dogs;

d.     whether Defendants have any reliable factual or scientific basis to support their representations regarding the Products;

e.     whether Defendants knew or should have known that their representations were misleading in light of b.-d. above;

f.     whether Defendants purported to disclaim any implied warranty;

g.     whether any limitation on warranty fails to meet its essential purpose;

h.     whether Defendant intended for Plaintiffs, the Class members, and others to rely upon Defendants' representations in using, recommending, or purchasing the Products;

i.     whether Defendants otherwise foresaw that Plaintiffs, the Class members, and others would rely upon Defendants' representations in using, recommending or purchasing the products;

j.     whether reasonable consumers would rely upon Defendants' representations in using, recommending or purchasing the products;

k.     whether the Class members suffered direct losses or damages;

l.     whether the Class members suffered indirect losses or damages; and

m.     whether the Class members are entitled to actual damages or other forms of monetary relief.

136.  Defendants engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class members. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate this action. Moreover, the common questions will yield common answers that will substantially advance the resolution of the case.

137.  <u>Typicality; Rule 23(a)(3)</u>: Plaintiffs' claims are typical of the claims of the Class members because Defendants injured all Class members through the uniform misconduct described herein; all Class members suffered injury due to Defendants' misrepresentations; and Plaintiffs seek the same relief as the Class members.

138.  There are no defenses available to Defendants that are unique to the named Plaintiffs.

139.  <u>Adequacy of Representation; Rule 23(a)(4)</u>: Plaintiffs are fair and adequate representative of the Class because Plaintiffs' interests do not conflict with the Class members' interests. Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendants. Furthermore, Plaintiffs have selected competent counsel who are experienced in class action and other complex litigation. Plaintiffs and Plaintiffs' counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

140.  <u>Superiority; Rule 23(b)(3)</u>: The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

a.  The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' misconduct.

b.  It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could

not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

c.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

d.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

141.  Notice: Plaintiffs and Plaintiffs' counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS FOR RELIEF

**COUNT I: Violations of California's Consumers Legal Remedies Act**
**(Cal. Civil Code § 1750, et seq.) (CLRA) on Behalf of the Class**

142.  Plaintiffs reallege and incorporate by reference ¶¶ 1-129 above.

143.  The CLRA prohibits deceptive practices by any business that provides goods, property, or services primarily for personal, family, or household purposes.

144.  Plaintiffs and the Class members are "consumers" as defined in California Civil Code § 1761(d).

145.   The Products are "goods" as defined in California Civil Code § 1761(a).

146.   Defendants are "persons" as defined in California Civil Code § 1761(c).

147.   Plaintiffs' and the Class members' purchases of the Products are "transactions" as defined in California Civil Code § 1761(e).

148.   Defendants' representations and omissions concerning the quality, benefits and effectiveness of the Products were false and/or misleading as alleged herein.

149.   Defendants' false or misleading representations and omissions were such that a reasonable consumer would attach importance to them in determining his or her purchasing decision.

150.   Defendants' false and misleading representations and omissions were made to the entire Class.

151.   Defendants knew or should have known their representations and omissions were material and were likely to mislead consumers, including Plaintiffs and the Class.

152.   Defendants' practices, acts, and course of conduct in marketing and selling the Products were and are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.

153.   Defendants' false and misleading representations and omissions were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiffs and Class members, and violated and continue to violate the following sections of the CLRA:

a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.     § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it was not.

154.   Defendants profited from the sale of the falsely, deceptively, and unlawfully

advertised Products to unwary consumers.

155.  Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

156.  Defendants' wrongful business practices were a direct and proximate cause of actual harm to Plaintiffs and to each Class member.

157.  Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiffs provided notice to Defendants of its alleged violations of the CLRA, demanding that Defendants correct such violations, and providing them with the opportunity to correct their business practices. If Defendants do not thereafter correct their business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act. Notice was sent via certified mail, return receipt requested on April 5 and April 15, 2019.

158.  Pursuant to California Civil Code § 1780, Plaintiffs seek injunctive relief, their reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

**COUNT II: Violations of California's False Advertising Law**
**(Cal. Bus. & Prof. Code §§ 17500, et seq.) (FAL) on Behalf of the Class**

159.  Plaintiffs reallege and incorporate by reference ¶¶ 1-129 above.

160.  The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or Personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

161.  It also is unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

162.  As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendants relating to the Products were and are deceptive and misleading.

163.  As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendants misled consumers acting reasonably as to Defendants' representations about quality, benefits, and effectiveness of the Products.

164.  Plaintiffs suffered injury-in-fact as a result of Defendants' actions as set forth herein because, as reasonable consumers, they purchased the Products in reliance on Defendants' false and misleading labeling claims concerning the Products' quality, benefits, and effectiveness.

165.  Defendants' business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Products in a manner that is untrue and misleading, which Defendants knew or reasonably should have known, and because Defendants omitted material information from their advertising.

166.  Defendants profited from sale of the falsely and deceptively advertised Products to reasonable but unwary consumers including Plaintiffs and the Class and Defendants have thereby been unjustly enriched.

167.  As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

168.  Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

**COUNT III: Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, et seq.) (UCL) on Behalf of the Class**

169.  Plaintiffs reallege and incorporate by reference ¶¶ 1-129 above.

170.  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

171.  Defendants' acts, omissions, misrepresentations, practices, and non-

disclosures as alleged herein constitute business acts and practices.

172.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein constitute unlawful, unfair, and fraudulent business practices in that they have the capacity to deceive reasonable consumers, including Plaintiffs and the Class, as to the benefits and effectiveness of the Products.

173.  Unlawful: The acts alleged herein are "unlawful" under the UCL in that they violate at least (a) the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (b) the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; and (c) California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq.*

174.  Unfair: Defendants' conduct with respect to the labeling, advertising, and sale of the Products was "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims, including Plaintiffs and the Class.

175.  Defendants' conduct with respect to the labeling, advertising, and sale of the Products also was and is unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of the False Advertising Law and Consumers Legal Remedies Act.

176.  Defendants' conduct with respect to the labeling, advertising, and sale of the Products was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

177.  Reasonable consumers, including Plaintiffs and the Class, purchased the Products believing they were beneficial and effective as claimed by Defendants when in fact they were not—a fact of which consumers could not reasonably have become aware.

178.  Fraudulent: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

179.  As set forth herein, Defendants' representations and omissions about the quality, benefits, and effectiveness of the Products were and are false and likely to mislead or deceive the public because a significant portion of the general consuming public, acting reasonably in the circumstances, could be misled by Defendants' representations and omissions.

180.  Defendants profited from its sale of the falsely, deceptively, and unlawfully advertised and packaged Products to unwary consumers.

181.  Defendants' conduct directly and proximately caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs and the Class have suffered injury-in-fact as a result of Defendants' unlawful conduct including but not limited to the damages described in ¶ 123.

182.  Plaintiffs and the Class are likely to continue to be damaged by Defendants' deceptive trade practices, because Defendants continue to disseminate misleading information on the Products' packaging and through the marketing and advertising of the Products.  Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

183.  In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

184.  Plaintiffs and the Class also seek an order for and restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

### COUNT IV: Breach of the Implied Warranty of Merchantability
### (Cal. Civil Code §§ 1791.1 & 1794) on Behalf of the Class

185.  Plaintiffs reallege and incorporate by reference ¶¶ 1-129 above.

186.  The Products are "consumer goods" within the meaning of California Civil Code § 1794(a).

187.  Plaintiffs and the Class members are "buyer[s] of consumer goods" within the meaning of California Civil Code § 1794(a).

188.  Defendants failed to comply with the obligations of California Civil Code § 1794 and thereby caused damage to Plaintiffs and the Class.

189.  Specifically, Defendants manufactured, tested, advertised, promoted, marketed, sold and distributed the Products.

190.  At the time Defendants manufactured, tested, advertised, promoted, marketed, sold and distributed the Products, Defendants knew of the particular purposes for which the supplements were intended and impliedly warranted the Products to be of merchantable quality.

191.  Defendants breached the implied warranty of merchantability and the Products were not of merchantable quality because: (a) the products were mislabeled; (b) the Products would not pass without objection in the trade; (c) the Products were not fit for ordinary purposes for which such goods are used; (d) the Products did not conform to the promises or affirmations of fact made on the container and/or label; and (e) the Products did not have the quality that reasonable buyers, including Plaintiffs and the Class, would expect.

192.  Defendants' breach of the warranty caused Plaintiffs and the Class economic harm for which Plaintiffs and the Class are entitled to monetary damages, costs, and reasonable attorneys' fees.

## COUNT V: Unjust Enrichment
## On Behalf of the Class

193.  Plaintiffs reallege and incorporate by reference ¶¶ 1-129 above.

194.  Because of their wrongful acts and omissions, Defendants charged a higher price for the Products than their true value and Defendants obtained monies that rightfully belong to Plaintiffs and the Class.

195.  Plaintiffs and the Class members conferred a benefit on Defendants by purchasing the Products.

196.  Defendants received a direct benefit from Plaintiffs and the Class in the form of Product sales, increased market share for the Products and resulting profits.

197.  Defendants knowingly accepted the unjust benefits of their fraudulent conduct, including the gains described in the preceding paragraph, to the detriment of Plaintiffs and the Class.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained gains and benefits.

198.  Accordingly, Plaintiffs, on behalf of themselves and the Class, seek an order requiring Defendants to make restitution to Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order or Orders:

A.    certifying the proposed Class under Federal Rule of Civil Procedure 23(a) and (b)(3), as set forth above, naming Plaintiffs as Class representatives and appointing Plaintiffs' counsel as Class counsel;

B.    declaring that Defendants are financially responsible for notifying the Class members of the pendency of this action;

C.    awarding monetary damages including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law and in accordance with the above allegations;

D.    providing for restitution and disgorgement and any further injunctive, declaratory or equitable relief the Court deems appropriate;

E.    enjoining Defendants from further misrepresentations or material omissions in their marketing, advertising, packages, packaging, labels and labeling for the Products;

E.    awarding Plaintiffs' reasonable costs and expenses of suit, including attorneys' fees;

G.    awarding pre- and post-judgment interest to the extent the law allows; and

H.    providing such further relief in law or equity as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated this 3rd day of May, 2019.

*s/Daniel L. Warshaw*
PEARSON, SIMON & WARSHAW, LLP
Daniel L. Warshaw
dwarshaw@pswlaw.com
Michael H. Pearson
mpearson@pswlaw.com
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
Fax: (818)788-8104

LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
Matthew D. Schultz
mschultz@levinlaw.com
Brenton Goodman
bgoodman@levinlaw.com
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140
Fax: (850) 436-6140

WHITFIELD, BRYSON & MASON, LLP
Daniel K. Bryson
dan@wbmllp.com
900 W Morgan St
Raleigh, NC  27603
Tel: (919) 600-5000
Fax: (919) 600-5035

GREG COLEMAN LAW, PC
Gregory F. Coleman
greg@gregcolemanlaw.com
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049

*Counsel for Plaintiffs & the Proposed Class*

**EXHIBIT A TO CLASS ACTION COMPLAINT**[14]

**PACKAGES & ACCOMPANYING INFORMATION**
**FOR PRODUCTS IDENTIFIED IN ¶17**

(a.)   Cosequin Regular Strength (capsule)



# COSEQUIN® Regular Strength

✓ #1 Veterinarian recommended joint health supplement brand▼

✓ Formulated to help keep healthy dogs active

## Available From Your Veterinarian

AVAILABLE IN: 132ct

---

[14] Source: https://www.cosequin.com/products/dogs (2/17/19).

(b.)   Cosequin DS Capsules (sprinkle capsule)



# COSEQUIN® DS Capsules

✓ #1 Veterinarian recommended joint health supplement brand▼
✓ Formulated to help keep healthy dogs active
✓ Cosequin® brand joint health supplement is shown to be safe, effective, and bioavailable in peer-reviewed, published, controlled U.S. veterinary studies

## Available From Your Veterinarian

AVAILABLE IN: 132ct

(c.)   Cosequin DS (chewable tablet)



(d.)   Cosequin DS Maximum Strength (chewable tablet)



# COSEQUIN® DS Maximum Strength

✓ #1 Veterinarian recommended retail joint health
   supplement brand▼
✓ Helps Support Mobility for a Healthy Lifestyle
✓ Available in tasty chewable tablets
✓ Cosequin® brand joint health supplement is shown to be
   safe, effective, and bioavailable in peer-reviewed,
   published, controlled U.S. veterinary studies

AVAILABLE IN: 110ct. Only

(e.)    Cosequin Hip & Joint Plus Perna & HA (chewable tablet)



# **COSEQUIN**® Hip & Joint Plus Perna & HA Chewable Tablets

✓ #1 Veterinarian recommended retail joint health supplement brand ▼

✓ Helps keep dogs active by maintaining healthy cartilage and providing joint support

✓ Tasty formula

AVAILABLE IN: 75ct. Only

(f.)   Cosequin Minis Plus MSM & Boswellia (soft chew (mini))



(g.) Cosequin DS Maximum Strength Plus MSM & Omega-3's (chewable tablets)



(h.)   Cosequin DS Maximum Strength Plus MSM & Boswellia (soft chew)



(i.)    Cosequin ASU Active Lifestyle (chewable tablet)



(j.)    Cosequin Omega-3 (liquid)



## COSEQUIN® Omega-3

✔  Omega-3 fish oil supplement formulated for skin and coat health

✔  Rich in EPA and DHA omega-3 fatty acids

✔  Helps support trainability in puppies

AVAILABLE IN: 8 oz

(k.)   Cosequin Calm (chewable bonelet)





(*l.*)   Cosequin Hip & Joint Support Plus (Plus: Green Lipped Mussel, Omega-3's and HA) (chewable       tablet)



(m.)  Cosequin Advanced (chewable tablet)



(n.)   Cosequin Minis Maximum Strength with MSM Plus Omega-3's (soft chew)



# COSEQUIN® Minis Maximum Strength with MSM Plus Omega-3's

✓ Joint Support with Skin & Coat Support
✓ #1 Veterinarian recommended retail joint health
   supplement brand▼
✓ Specially formulated and designed for dogs under 25 lbs.
   ✓ Tasty formula
   ✓ Mini sized chews
✓ Cosequin® brand joint health supplement is shown to be
   safe, effective, and bioavailable in peer-reviewed,
   published,
   controlled U.S. veterinary studies

AVAILABLE IN: 45ct Only

(*o.*)   Cosequin MaxStrength Plus MSM (chewable tablet)



(p.)   Cosequin MaxStrength with MSM Plus Omega-3's (soft chew)

